UNITED STATES v. STANFORD.

(Circuit Court, N. D. California. June 29, 1895.)

No. 12,053.

1. PUBLIC LANDS—GRANT TO CENTRAL PACIFIC RAILROAD.
By Act Cong. July 1, 1862 (12 Stat. 489), the Union Pacific Railroad Company was created and authorized to build a road from a point in Nebraska territory to the terminus of the Central Pacific Railroad Company of California. The act contained a grant of lands to the company, and a promise by the United States to issue subsidy bonds on the completion of each 40 miles of road. The act also authorized the Central Pacific to extend its lines to the eastern border of California, in order to connect with the Union Pacific, on the "same terms and conditions in all respects" as were contained in the act for the construction of the Union Pacific, and authorized it to further extend its lines to the Missouri river, "on the terms and conditions provided in this act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and the whole line of said railroad and branches and telegraph is completed." Held, that the grants made by the act to the Central Pacific were precisely the same in character and amount as those made to the Union Pacific.

2. RAILROAD COMPANIES—REPAYMENT OF BONDS—GRANTS ON CONDITION.
Act Cong. July 1, 1862 (12 Stat. 489), granting lands and subsidy bonds to the Union and Central Pacific Railroad Companies, expressly provided that neither the lands nor the bonds were to be delivered until the particu-

---

[1] 14 C. C. A. 112.

lar section of road to which they applied was completed, and that, to se-
cure payment to the United States, the issuance and delivery of the bonds
should, ipso facto, constitute a first mortgage on the whole line. Section
6 of the act provided that the grants were made "on condition that said
company shall pay said bonds at maturity," and allowed compensation for
services to the government to be applied in payment of the bonds, and al-
lowed payment to be made wholly or in part in the same, or other bonds or
treasury notes or other evidences of debt against the United States. *Held*,
that, though there was no express covenant by the railroad companies re-
ceiving the bonds to repay the United States the amount thereof, the law
implies from the provisions of the act and their acceptance by the com-
panies an absolute and unqualified promise on their part for such repay-
ment.

3. SAME—ENFORCEMENT BY UNITED STATES.
Act Cong. July 1, 1862, creating the Union Pacific Railroad Company,
and granting to it and the Central Pacific Company lands and subsidy
bonds, in section 5 provides that the issuance and delivery of the bonds
shall constitute a first mortgage on the road and its appurtenances, and for
forfeiture to the United States on default in payment of the bonds, pro-
vided "this section shall not apply to that part of any road now con-
structed." *Held*, that though the proviso, considered alone, might be con-
strued to confine the property out of which the government could enforce
repayment of the bonds to the property constructed with government aid,
when construed with section 6, providing that repayment may be made
"wholly or in part in the same or in other bonds, treasury notes, or other
evidences of debt against the United States," it does not limit the United
States, in enforcing repayment, to the road and its appurtenances.

4. CORPORATIONS—LIABILITY OF STOCKHOLDERS.
The decision of the supreme court of California that Const. Cal. 1849,
art. 4, §§ 32, 36, providing that corporate debts shall be secured by "such
individual liability of the corporations, and other means, as may be pre-
scribed by law," and that "each stockholder of a corporation or joint stock
association shall be individually and personally liable for his proportion of
all its debts and liability," were not self-executing, and did not furnish a
rule by which the amount of a stockholder's individual liability could be
fixed, is binding on the federal courts.

5. SAME.
Act Cal. May 20, 1861, providing that each corporate stockholder shall
be "individually liable to the creditors of such company for his proportion,
that is to say, in proportion to the amount of stock held by him," without
stating whether the proportion is to the whole amount of capital stock or
to the amount subscribed, or fixing any method of obtaining the proportion,
is too indefinite to give effect to Const. Cal. 1849, art. 4, § 36. providing in
general for the individual liability of corporate stockholders.

6. SAME.
Act Cal. April 27, 1863, and Civ. Code Cal. § 322, fixing a definite indi-
vidual liability on stockholders for corporate debts, having been passed
after the acceptance by the Central Pacific and Western Pacific Railroad
Companies of the benefits of Act Cong. July 1, 1862, cannot affect the rights
of the parties under that act.

7. RAILROAD COMPANIES—ACCEPTANCE OF BENEFITS FROM UNITED STATES.
Though the Central and Western Pacific Railroad Companies were organ-
ized under California laws, their subsequent acceptance of the benefit of
Act Cong. July 1, 1862, granting lands and bonds to aid in extending their
lines, created a contract which is the sole test of the liability of their stock-
holders for repayment of the bonds issued thereunder, unaffected by the
laws of the state existing at the time of such acceptance.

In Equity. Bill by the United States of America against Jane
L. Stanford, as executrix of the last will of Leland Stanford, de-
ceased, to enforce against the estate decedent's liability as stock-
holder in the Western Pacific, Central Pacific, and Union Pacific

Railroad Companies, for default in payment of bonds issued by complainants to such companies.    Heard on demurrer to the bill.

H. S. Foote, U. S. Atty., and L. D. McKisick, Special Asst. U. S. Atty., for the United States.

Russel J. Wilson, Mountford S. Wilson, John Garber, and F. E. Spencer, for respondent.

ROSS, Circuit Judge.    The Central Pacific Railroad Company of California was incorporated June 28, 1861, under and by virtue of the laws of the state of California, with a capital stock of $8,500,000, divided into shares of the par value of $100 each, for the purpose of building a railroad estimated to be 115 miles in length, from the city of Sacramento, through Sacramento, Placer and Nevada counties, to the eastern boundary of the state of California.

July 1, 1862, congress passed an act (12 Stat. 489) by which it created the Union Pacific Railroad Company, and authorized and empowered that company to locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph, with the appurtenances, from a point on the 100th meridian of longitude west from Greenwich, between the south margin of the valley of the Republican river and the north margin of the valley of the Platte river, in the then territory of Nebraska, at a point to be fixed by the president of the United States after actual surveys; thence running westerly, upon the most direct, central, and practicable route, through the then territories of the United States to the western boundary of the then territory of Nevada, there to meet and connect with the line of the Central Pacific Railroad Company of California.

By section 2 of the act of 1862, congress granted to the Union Pacific Railroad Company a right of way through the public lands for the construction of the railroad and telegraph line it was authorized to build, together with all necessary grounds for stations, buildings, workshops, depots, machine shops, switches, sidetracks, turntables, and water stations, and the right to take, from the public lands adjacent to the line of its road, earth, stone, timber, and other material for its construction.    To further aid in its construction, congress, by section 3 of the act, granted to the corporation it then created five alternate sections of the public lands on each side of the road, with certain reservations and exceptions, not important to be mentioned, which lands, it was provided by section 4 of the act, should be patented to the company as fast as the company should complete 40 consecutive miles of any portion of the railroad and telegraph line, properly equipped and ready for the service contemplated by the act, to be shown by the certificate of commissioners authorized to be appointed by the president.    And by section 5 it was enacted that, upon the certificate in writing of the commissioners so appointed of the completion and equipment of 40 consecutive miles of the railroad and telegraph line the Union Pacific Railroad Company was by the act authorized to construct, the secretary of the interior should issue to the company bonds of the United States of $1,000 each, payable in 30 years after date, bearing 6 per

centum per annum interest, interest payable semiannually, to the amount of 16 of such bonds per mile for such section of 40 miles; "and," proceeds the statute, "to secure the repayment to the United States, as hereinafter provided, of the amount of said bonds so issued and delivered to said company, together with all interest thereon which shall have been paid by the United States, the issue of said bonds and delivery to the company shall ipso facto constitute a first mortgage on the whole line of the railroad and telegraph, together with the rolling stock, fixtures, and property of every kind and description, and in consideration of which said bonds may be issued; and on the refusal or failure of said company to redeem said bonds, or any part of them, when required so to do by the secretary of the treasury, in accordance with the provisions of this act, the said road, with all the rights, functions, immunities and appurtenances thereunto belonging, and also all lands granted to the said company by the United States, which, at the time of said default, shall remain in the ownership of the said company, may be taken possession of by the secretary of the treasury, for the use and benefit of the United States: provided, this section shall not apply to that part of any road now constructed.

The next section of the act of 1862 is as follows:

"Sec. 6. And be it further enacted, that the grants aforesaid are made upon condition that said company shall pay said bonds at maturity and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit dispatches over said telegraph line, and transport mails, troops and munitions of war, supplies and public stores upon said railroad for the government whenever required to do so by any department thereof, and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service); and all compensation for services rendered for the government shall be applied to the payment of said bonds and interest until the whole amount is fully paid. Said company may also pay the United States, wholly or in part, in the same or other bonds, treasury notes or other evidences of debt against the United States, to be allowed at par; and after said road is completed, until said bonds and interest are paid, at least 5 per centum of the net earnings of said road shall also be annually applied to the payment thereof."

By section 7 the Union Pacific Company was required to file its assent to the provisions of the act, and to complete its road, within a certain designated date.

By section 9, the Leavenworth, Pawnee & Western Railroad of Kansas was authorized to construct a railroad and telegraph line from the Missouri river, at the mouth of the Kansas river, on the south side thereof, so as to connect with the Pacific Railroad of Missouri, to the aforesaid point on the 100th meridian of longitude west from Greenwich, upon the same terms and conditions as were provided in the act for the construction of the Union Pacific railroad and telegraph line, and there to connect with the Union Pacific Company, and with certain provisions for connections with railroads from Missouri and Iowa, also provided for by the act. And section 9 of the act of 1862 contained this further provision:

"The Central Pacific Railroad Company of California, a corporation existing under the laws of the state of California, are hereby authorized to con-

struct a railroad and telegraph line from the Pacific coast, at or near San Francisco, or the navigable waters of the Sacramento river, to the eastern boundary of California, upon the same terms and conditions, in all respects, as are contained in this act for the construction of said railroad and telegraph line first mentioned (namely, the Union Pacific Railroad Company), and to meet and connect with the first-mentioned railroad and telegraph line on the eastern boundary of California."

Both the Central Pacific Railroad Company of California and the Kansas Company mentioned were by the act required to file their assent to its provisions, and to complete their respective roads within certain specified dates. And the act of 1862, in section 10, proceeded to provide that those companies, or either of them, after completing their respective roads—

"May unite upon equal terms with the first named company (the Union Pacific Railroad Company) in constructing so much of said railroad and telegraph line, and branch railroads and telegraph lines, in this act hereinafter mentioned, through the territories from the state of California to the Missouri river, as shall then remain to be constructed, on the same terms and conditions as provided in this act in relation to the said Union Pacific Railroad Company. And the Hannibal and St. Joseph Railroad, the Pacific Railroad Company of Missouri, and the first-named company (the Union Pacific Railroad Company), or either of them, on filing their assent to this act, as aforesaid, may unite upon equal terms, under this act, with the said Kansas Company, in constructing said railroad and telegraph, to said meridian of longitude, with the consent of the said state of Kansas; and in case said first-named company (the Union Pacific Railroad Company) shall complete their line to the eastern boundary of California before it is completed across said state by the Central Pacific Railroad Company of California, said first-named company (the Union Pacific Railroad Company) is hereby authorized to continue in constructing the same through California, with the consent of said state, upon the terms mentioned in this act, until said roads shall meet and connect, and the whole line of said railroad and telegraph is completed; and the Central Pacific Railroad Company of California, after completing its road across said state, is authorized to continue the construction of said railroad and telegraph through the territories of the United States to the Missouri river, including the branch roads specified in this act, upon the routes hereinbefore and hereinafter indicated, on the terms and conditions provided in this act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and the whole line of said railroad and branches and telegraph is completed."

By section 11, additional aid was provided for those portions of the road most mountainous and difficult of construction; and by section 12 provision was made in respect to the grades and curves and for uniformity in the width of the track upon the entire line of railroad and branches. The section further provided that "the whole line of said railroad and branches and telegraph shall be operated and used for all purposes of communication, travel and transportation so far as the public and government are concerned, as one connected, continuous line."

By section 13 authority was given the Hannibal & Saint Joseph Railroad Company of Missouri to extend its roads from Saint Joseph, via Atchison, to connect and unite with the road through Kansas, upon filing its assent to the provisions of the act, upon the same terms and conditions, in all respects, for 100 miles in length next to the Missouri river, as are provided in the act for the construction of the railroad and telegraph of the Union Pacific Railroad Company.

By section 14 the Union Pacific Company was authorized and required to construct a single line of railroad and telegraph from a point on the western boundary of the state of Iowa, to be fixed by the president of the United States, upon the most direct and practicable route, to be subject to his approval, so as to form a connection with the main line of the Union Pacific Company at some point on the 100th meridian of longitude aforesaid, upon the same terms and conditions, in all respects, as are contained in the act for the construction of the main line of railroad and telegraph of the Union Pacific Railroad Company, with a provision for the completion of that branch line within a certain specified time after the filing by the company of its assent to the provisions of the act, and with the further provision "that a failure upon the part of said company to make said connection in the time aforesaid, and to perform the obligations imposed on said company by this section, and to operate said road in the same manner as the main line shall be operated, shall forfeit to the government of the United States all the rights, privileges, and franchises granted to and conferred upon said" Union Pacific Company by the act of 1862.  By section 14 of the act of 1862 it was further provided 'that, whenever there should be completed a line of railroad through Minnesota or Iowa to Sioux City, the aforesaid Pacific Railroad Company was authorized and required to construct a line of railroad and telegraph from Sioux City upon the most direct and practicable route to a point on, and so as to connect with, either the branch or main line of the Union Pacific Company, such point or junction to be fixed by the president of the United States, not further west than the 100th meridian of longitude aforesaid, and on the same terms and conditions as provided in the act for the construction of the Union Pacific Railroad Company, and to complete the same at the rate of 100 miles a year, with the further provision that, should the Pacific Railroad Company fail to comply with the requirements of the act in relation to the Sioux City railroad and telegraph, it should suffer the same forfeitures prescribed in relation to the Iowa branch railroad and telegraph.

By section 15 it was provided that any other railroad company then incorporated, or that might thereafter be incorporated, should have the right to connect their road with the road and branches provided for by the act at such places and upon such just and equitable terms as the president of the United States should prescribe; and by section 16 it was provided that, at any time after the passage of the act, all of the railroad companies named therein and assenting to its provisions, or any two or more of them, were authorized to form themselves into a consolidated company, notice of such consolidation, in writing, to be filed in the department of the interior, and thereafter to proceed to construct the railroad and branches and telegraph line upon the terms and conditions provided in the act.

Sections 17 and 18 of the act of 1862 are as follows:

"Sec. 17. And be it further enacted, that in case said company or companies shall fail to comply with the terms and conditions of this act by not completing

said road and telegraph and branches within a reasonable time, or by not keeping the same in repair and use, but shall permit the same for an unreasonable time to remain unfinished or out of repair and unfit for use, congress may pass any act to insure the speedy completion of said road and branches, or put the same in repair and use, and may direct the income of said railroad and telegraph line to be thereafter devoted to the use of the United States, to repay all such expenditures caused by the default and neglect of such company or companies: provided, that if said roads are not completed so as to form a continuous line of railroad ready for use from the Missouri river to the navigable waters of the Sacramento river in California by the 1st day of July, eighteen hundred and seventy-six, the whole of all said railroads before mentioned and to be constructed under the provisions of this act, together with all their furniture, fixtures, rolling stock, machine shops, lands, tenements and hereditaments, and property of every kind and character, shall be forfeited to and taken possession of by the United States: provided, that of the bonds of the United States in this act provided to be delivered for any and all parts of the roads to be constructed east of the one-hundredth meridian of west longitude from Greenwich, and for any part of the road west of the west foot of the Sierra Nevada Mountains, there shall be reserved of each part and installment twenty-five per centum, to be and remain in the United States treasury, undelivered, until said road and all parts thereof provided for in this act are entirely completed; and of all the bonds provided to be delivered for the said road, between the two points aforesaid, there shall be reserved out of each installment fifteen per centum, to be and remain in the treasury until the whole of the road provided for in this act is fully completed; and if the said road or any part thereof shall fail of completion at the time limited therefor in this act, then and in that case the said part of said bonds so reserved shall be forfeited to the United States.

"Sec. 18. And be it further enacted, that whenever it appears that the net earnings of the entire road and telegraph, including the amount allowed for services rendered for the United States, after deducting all expenditures, including repairs, and the furnishing, running and managing of said road, shall exceed ten per centum upon its cost, exclusive of the five per centum to be paid to the United States, congress may reduce the rates of fare thereon, if unreasonable in amount, and may fix and establish the same by law. And the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes, congress may at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act."

On April 4, 1864, the legislature of California passed an act entitled "An act to aid in carrying out the provisions of the Pacific railroad and telegraph act of congress, and other matters relating thereto," declaring that:

"To enable the said company [the Central Pacific Railroad Company of California] more fully and completely to comply with and perform the provisions and conditions of said act of congress, the said company, their successors and assigns, are hereby authorized and empowered, and the right, power, and privilege is hereby granted to, conferred upon, and vested in them, to construct, maintain and operate the said railroad and telegraph line, not only in the state of California, but also in the said territories lying east of and between said state and the Missouri river," etc., and "confirming to and vesting in said company all the rights, privileges, franchises, power and authority conferred upon, granted to, or vested in said company by said act of congress; hereby repealing all laws and parts of laws inconsistent or in conflict with the provisions of this act or the rights and privileges herein granted." St. Cal. 1863–64, p. 471.

Shortly after the passage of the act of congress of July 1, 1862, that is to say on the 11th of December, 1862, the Western Pacific

Railroad Company was incorporated under and by virtue of the same laws of the state of California that the Central Pacific Railroad Company of California was organized under, and with a capital stock of $5,400,000, divided into shares of the par value of $100 each, for the purpose of constructing and maintaining a railroad from a point on the San Francisco & San José Railroad, at or near San José to Sacramento, there to connect with the Central Pacific Railroad Company of California.

July 2, 1864, congress passed an act (13 Stat. 356), amending that of July 1, 1862, in certain important particulars, thereby, among other things, largely increasing the quantity of land granted by the act of 1862 to the respective railroad companies therein named, and so amending section 5 of that act as to authorize the Union Pacific Railroad Company, the Central Pacific Railroad Company, and any other company authorized to participate in the construction of the road therein provided for, on the completion of each section of the road, as provided in the act and in that to which it was an amendment, to issue their first mortgage bonds on their respective railroad and telegraph lines in an amount not exceeding the amount of the bonds of the United States, and of even tenor and date, time of maturity, rate and character of interest, with the bonds authorized to be issued to the railroad companies respectively, and making the lien of the United States bonds subordinate to that of the bonds so authorized to be issued by the respective railroad companies.

By section 16 of the amendatory act it was provided, among other things:

"That any two or more of the companies authorized to participate in the benefits of this act, are hereby authorized at any time to unite and consolidate their organizations, as the same may, or shall be, upon such terms and conditions, and in such manner as they may agree upon, and as shall not be incompatible with this act, or the laws of the state or states in which the roads of such companies may be, and to assume and adopt such corporate name and style as they may agree upon, with a capital stock not to exceed the actual cost of the roads so to be consolidated, and shall file a copy of such consolidation in the department of the interior; and thereupon such organization, so formed and consolidated, shall succeed to, possess, and be entitled to receive, from the government of the United States, all and singular the grants, benefits, immunities, guarantees, acts, and things to be done and performed, and be subject to the same terms, conditions, restrictions, and requirements which said companies respectively, at the time of such consolidation, are or may be entitled or subject to under this act, in place and substitution of said companies so consolidated respectively. And all other provisions of this act, so far as applicable, relating or in any manner appertaining to the companies so consolidated, or either thereof, shall apply and be of force as to such consolidated organization. And in case upon the completion by such consolidated organization of the roads, or either of them, of the companies so consolidated, any other of the road or roads of either of the other companies authorized as aforesaid, (and forming, or intended or necessary to form, a portion of a continuous line from each of the several points on the Missouri river, hereinbefore designated, to the Pacific coast,) shall not have constructed the number of miles of its said road within the time herein required, such consolidated organization is hereby authorized to continue the construction of its road and telegraph in the general direction and route upon which such incomplete or unconstructed road is hereinbefore authorized to be built, until such continuation of the road of such consolidated organization shall reach the constructed road and tele-

graph of said other company, and at such point to connect and unite therewith; and for and in aid thereof the said consolidated organization may do and perform, in reference to such portion of road and telegraph as shall so be in continuation of its constructed road and telegraph, and to the construction and equipment thereof, all and singular, the several acts and things hereinbefore provided, authorized, or granted to be done by the company hereinbefore authorized to construct and equip the same, and shall be entitled to similar and like grants, benefits, immunities, guarantees, acts, and things to be done and performed by the government of the United States, by the president of the United States, by the secretaries of the treasury and interior, and by commissioners in reference to such company, and to such portion of the road hereinbefore authorized to be constructed by it, and upon the like and similar terms and conditions, so far as the same are applicable thereto."

To the provisions of both of the acts of Congress mentioned, the Central Pacific Railroad Company of California, in due time, filed its acceptance; and on October 8, 1864, under and by virtue of an act of the legislature of California, entitled "An act to authorize the relocation of the route of the railroad of the Central Pacific Railroad Company of California," approved April 17, 1863 (St, Cal. 1863, p. 320), it filed amended articles of incorporation in the office of the secretary of state of California, by which articles its capital stock was increased to $20,000,000, divided into 200,000 shares of the par value of $100 each, and defining the route of its road from Sacramento to the eastern boundary of California, as relocated; and on July 23, 1868, it increased its capital stock from $20,000,000, to $100,000,000.

By agreement between the Central Pacific Railroad Company of California and the Western Pacific Railroad Company, the latter, with the consent of congress, expressed in an act approved March 3, 1865 (13 Stat. 504), became entitled to the same privileges and benefits conferred by the acts of July 1, 1862, and July 2, 1864, on the Central Pacific Railroad Company of California, subject to all of the conditions thereof; and on July 22, 1870, those two companies were, under and by virtue of the laws of the state of California, amalgamated and consolidated into one company by the name of Central Pacific Railroad Company, the declared objects of which were, in part, to purchase, construct, own, maintain, and operate the railroad and telegraph lines of the constituent companies, so as to form a continuous line of railway and telegraph from Ogden, in the territory of Utah, at its connecting point with the Union Pacific Railroad Company, to the several points mentioned in the several articles of association of the constituent companies. The capital stock of the consolidated company was fixed at $100,000,000, divided into 1,000,000 shares, of the par value of $100 each; and it succeeded to all of the property and rights of the constituent companies, and assumed all of their liabilities and obligations.

In all of the California corporations mentioned, the deceased, Leland Stanford, was a stockholder. The bill alleges that from January 16, 1865, to December 31, 1869, complainants, in pursuance of the provisions of the aforesaid acts of congress, issued and delivered to the Central Pacific Railroad Company of California, to aid it in the construction of the railroad and telegraph line, their bonds to the amount of $25,885,120, which was in full performance of their obligation under the statute in respect to the bonds, and was so

accepted by the company; that, when said bonds were so issued and delivered, the deceased, Stanford, was the owner of 130,887 shares of the stock of the company, its total subscribed stock being 520,000 shares or thereabouts; that complainants have paid all the interest on the bonds so issued to the Central Pacific Railroad Company of California as it became payable semiannually, and that they will continue to do so until the maturity of each bond; that the first four installments of said bonds, amounting to $2,362,000 of principal, matured and became due and payable on the 16th day of January, 1895, and the same were on that day paid by complainants; that, in like manner and for the like purpose, complainants issued and delivered to the Western Pacific Railroad Company their bonds to the amount of $1,970,560, which were in like manner accepted by that company, at which time the deceased, Stanford, was the owner of 13,500 shares of its stock, and on which bonds complainants have paid the interest semiannually as it matured. The bill alleges that no part of the money so paid by complainants has been repaid; that the whole amount of principal and interest of the bonds so loaned to the Central Pacific Railroad Company of California and Western Pacific Railroad Company will, at the maturity of the whole, be about $78,000,000; that the Central Pacific Railroad Company, the successor of the two aided companies, is insolvent, and that all of its property is mortgaged or hypothecated to secure the payment of debts and liabilities greatly in excess of its whole value; that the whole amount of money now in or that may hereafter come into the sinking funds created by law to which complainants are or may be entitled will not be sufficient to pay more than one-tenth of the amount that will become due the complainants; that complainants have no security therefor except a second statutory mortgage on the bond-aided lines of the Central Pacific Railroad Company, which second statutory mortgage is of no value, or, if of any value, is insufficient, together with the sinking funds moneys, to reduce the amounts that will become due complainants below $60,000,000, the whole of which the Central Pacific Company is, and will continue to be, wholly without means to pay. And complainants, having presented their claim to the executrix of the estate of the deceased, Stanford, for $15,000,000, which they claim he in his lifetime promised to pay them at certain times in the years 1895 to 1899, including those years, in consideration of aid furnished the railroad companies of which he was then a stockholder, and the said claim having been rejected by the executrix, the complainants brought this suit to establish their claim. A demurrer to the bill raises the question of its sufficiency.

The important questions involved in this case have been very ably argued by counsel, and have been very carefully considered by the court. I proceed to state, as briefly as the nature of the case admits of, my views and conclusions in respect to such of them as I consider necessary to a decision of the case, observing, in limine, that it will not do for the court to be controlled or in any way influenced, in the interpretation of the contract which forms the basis of the suit, by any event subsequently occurring. On the contrary, the

contract between the government, on the one side, and the railroad companies, on the other, is to be sought in the provisions of the statute, and there only, interpreted by the light of the circumstances and conditions existing at the time it was made. Neither the vast sums of money realized by the defendant's testator and his associates out of the construction and operation of the railroads in question, nor the purposes to which the deceased, Stanford, devoted a large part of his share of such profits, are proper subjects for consideration in this inquiry. The questions here, and the only questions, are, what were the liabilities assumed by Stanford, and, if he shall be found to have assumed an individual liability for the repayment of the bonds loaned by the United States to the railroad companies in which he was the holder of stock, whether the suit of the government is barred by the lapse of time.

The Central Pacific Railroad Company of California, which, as has been stated, was incorporated June 28, 1861, was organized and put into operation prior to the passage by congress of any of the Pacific Railroad acts. Leland Stanford, C. P. Huntington, Mark Hopkins, and Charles Crocker were among its incorporators, and each of them subscribed for 150 of the 85,000 shares into which the stock of that corporation was divided by its articles of incorporation. There were also other subscribers for its stock, two for similar amounts as the four already named, and still others in smaller amounts. The then existing laws of the state of California, under and pursuant to which the Central Pacific Railroad Company of California was incorporated, were sections 31, 32, and 36 of article 4 of the constitution of 1849, and the provisions of an act of the legislature of the state of California, entitled "An act to provide for the incorporation of railroad companies and the management of the affairs thereof, and other matters relating thereto," approved May 20, 1861. St. Cal. 1861, p. 607.

The sections of the state constitution referred to read as follows:

"Sec. 31. Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed.

"Sec. 32. Dues from corporations shall be secured by such individual liability of the corporations, and other means, as may be prescribed by law."

"Sec. 36. Each stockholder of a corporation, or joint-stock association, shall be individually and personally liable for his proportion of all its debts and liabilities."

The act of the legislature of California approved May 20, 1861, providing for the incorporation of railroad companies, contained in its twelfth section the following provision in respect to the liabilities of stockholders in such corporations, which is the only provision therein pertinent to this case:

"Any stockholder transferring his shares of stock in manner aforesaid (that is to say, in the manner previously provided in the act), and in compliance with the by-laws of the company, and the same being approved by the board of directors as aforesaid, shall, from and after the date of such approval, cease to be a stockholder in such company, and shall not be liable to any future calls from the directors, nor for any debts that may be contracted by said company thereafter. But this shall not release him from his proportion of

debts and liabilities contracted by the company prior to his ceasing to be a stockholder; but each stockholder of such company shall be individually liable to the creditors of such company for his proportion; that is to say, in proportion to the amount of stock by him held, for all the debts and liabilities of such company, except as above provided."

Although Stanford, Huntington, Hopkins, and Crocker were only subscribers for 600 shares, in the aggregate, of the stock of the Central Pacific Railroad Company of California, they were undoubtedly the moving and controlling spirits in the undertaking, and, beyond question, had in view congressional aid for the railroad that company was organized to build. Indeed, for many years the state of California, through its legislature, had been endeavoring to induce congress to take such steps as would insure the building of a transcontinental railroad. As early as May 1, 1852, an act of the state was passed reciting "that the interests of this state, as well as those of the whole Union, require the immediate action of the government of the United States for the construction of a national thoroughfare connecting the navigable waters of the Atlantic and Pacific Oceans, for the purposes of national safety, in the event of war, and to promote the highest commercial interests of the republic," and granting the right of way through the state to the United States for the purpose of constructing such a road. St. Cal. 1852, p. 150. Congress not having acted, in 1859 a resolution was passed by the legislature of the state calling a convention "to consider the refusal of congress to take efficient measures for the construction of a railroad from the Atlantic states to the Pacific, and to adopt measures whereby the building of said railroad can be accomplished" (St. Cal. 1859, p. 391); and at the same session of the legislature a memorial was adopted asking congress to pass a law authorizing a construction of such a road, and asking also a grant of lands to aid in the construction of railroads in the state (Id. p. 395).

Notwithstanding the urgent needs for such a road, it was not until July 1, 1862, that congress passed the first of what are known as the "Pacific Railroads Acts." The reasons which finally moved it to action in the premises are matters of common knowledge. They are very clearly and tersely stated by the supreme court in the case entitled U. S. v. Union Pac. R. Co., 91 U. S. 72. As said by the court in that case: "Many of the provisions in the original act of 1862 are outside of the usual course of legislative action concerning grants to railroads, and cannot be properly construed without reference to the circumstances which existed when it was passed." The legislation in question is, indeed, sui generis. It was enacted at a time when the very life of the nation was in peril, and in large measure in the interest of national safety. Many lesser considerations conduced to the enactment; such as the promotion of commerce between the states, the opening up and settlement of the vast unpeopled territory that lay between the then settled portions of the country, as also the hope of cheaper transportation of the mails and supplies for the Indians. All of these considerations, and others that might be mentioned, gave to the needed road a national character. The main line was to be about 2,000 miles in length, and was to cross deserts,

rugged mountains, and a country inhabited by Indians jealous of intrusion upon their rights. The difficulties then in the way of its construction were very great; great even for the government,—far too great to have been then secured by private means without government aid. Congress, therefore, undertook to secure the building of the road. It found then in existence a California corporation called the Central Pacific Railroad Company of California, organized for the purpose of building a railroad from Sacramento, Cal., to the eastern boundary of that state; and it adopted that corporation in and by the act it passed July 1, 1862, as one of its instruments in the undertaking. By the same act it created a corporation, and called it the Union Pacific Railroad Company, to build a line of railroad and telegraph from a point in the then territory of Nebraska, to be fixed by the president of the United States, within certain specified limits, on the 100th meridian] of longitude west from Greenwich, and running thence by the most direct, central, and practicable route through the then territories of the United States, to the western boundary of the then territory of Nevada, there to meet and connect with the line of the Central Pacific Railroad Company of California; and it also made provision for various eastern connections with the main line. All of this was done in and by the same act of congress, —that of July 1, 1862. Whatever aid it thereby granted to the various railroad companies mentioned in it, whether in land, bonds, or other privileges, was granted upon the same terms and subject to the same conditions as was the grant it thereby made to the Union Pacific Railroad Company, for the statute in express terms so declares, and, after the most attentive reading of the entire act, I am unable to discover a single sentence or word indicating a contrary intention.

In respect to the Central Pacific Railroad Company of California it is provided in section 9 of the act of July 1, 1862, that that company is—

"Hereby authorized to construct a railroad and telegraph line from the Pacific coast, at or near San Francisco, or the navigable waters of the Sacramento river, to the eastern boundary of California upon the same terms and conditions, in all respects, as are contained in this act for the construction of said railroad and telegraph line first mentioned [namely, the Union Pacific Railroad], and to meet and connect with the first mentioned railroad and telegraph line [namely, the Union Pacific Railroad] on the eastern boundary of California."

And in section 10 of the act of July 1, 1862, it is provided that:

"The Central Pacific Railroad Company of California, after completing its road across said state (the state of California), is authorized to continue the construction of said railroad and telegraph through the territories of the United States to the Missouri river, including the branch roads specified in this act, upon the routes hereinbefore and hereinafter indicated, on the terms and conditions provided in this act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and the whole line of said railroad and branches and telegraph is completed."

In view of this language of the statute, it is beyond question that the grants made by the act of July 1, 1862, to the Central Pacific Railroad Company of California were precisely the same in character

and amount as those made to the Union Pacific Company; and it was so expressly adjudged by the supreme court in the Sinking Fund Cases, reported in 99 U. S. 700–728. The terms and conditions of those grants are to be ascertained by a resort to the statute. Having been duly accepted by the railroad companies in question, they constitute the contract between the respective parties, from which the companies cannot depart, and which the government cannot change or alter except in the mode reserved to it by law. If, upon so elementary a proposition, authority is needed, it may be found in the decision in the Sinking Fund Cases, 99 U. S. 718, 719, and in Union Pac. R. Co. v. U. S., 104 U. S. 662.

Now, looking at the statute of July 1, 1862, it is seen that section 2 grants the right of way through the public lands for the contemplated railroad and telegraph line, together with the incidental ground for stations, shops, etc. Section 3 grants, in aid of its construction, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of the road, with certain limitations and exceptions not important to mention. Section 4 provides that whenever the company shall have completed 40 consecutive miles of any portion of the road, properly supplied and equipped, and ready for the service contemplated by the act, the president of the United States shall appoint three commissioners to examine and report to him in relation thereto; and, if it shall appear to him that 40 consecutive miles of the railroad and telegraph line have been completed and equipped in all respects as required by the act, patents for the land granted, on each side of the road as far as the same is completed, shall be issued. Section 5 provides that the secretary of the treasury, upon a like certificate in writing of the commissioners so appointed by the president of the completion and equipment of 40 consecutive miles of the railroad and telegraph, in accordance with the provisions of the act, shall—

"Issue to said company bonds of the United States of $1,000 each, payable in 30 years after date, bearing 6 per centum per annum interest (said interest payable semiannually), which interest may be paid in United States treasury notes or any other money or currency which the United States have or shall declare lawful money and a legal tender to the amount of sixteen of said bonds per mile for such section of forty miles; and to secure the repayment to the United States, as hereinafter provided, of the amount of said bonds so issued and delivered to said company, together with all interest thereon which shall have been paid by the United States, the issue of said bonds and delivery to the company shall ipso facto constitute a first mortgage on the whole line of the railroad and telegraph, together with the rolling stock, fixtures and property of every kind and description, and in consideration of which said bonds may be issued; and on the refusal or failure of said company to redeem said bonds, or any part of them, when so required to do by the secretary of the treasury, in accordance with the provisions of this act, the said road, with all the rights, functions, immunities and appurtenances thereunto belonging, and also all lands granted to the said company by the United States, which, at the time of said default, shall remain in the ownership of the said company, may be taken possession of by the secretary of the treasury, for the use and benefit of the United States: provided, this section shall not apply to that part of any road now constructed."

Section 6 enacts:

"That the grants aforesaid [that is to say, the grants of right of way, ground for stations, shops, etc., lands and bonds] are made upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit dispatches over said telegraph lines, and transport mails, troops and munitions of war, supplies and public stores upon said railroad for the government, whenever required to do so by any department thereof, and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service) and all compensation for services rendered for the government shall be applied to the payment of said bonds and interest until the whole amount is fully paid. Said company may also pay the United States, wholly or in part, in the same or other bonds, treasury notes or other evidences of debt against the United States, to be allowed at par; and after said road is completed, until said bonds and interest are paid, at least five per centum of the net earnings of said road shall also be annually applied to the payment thereof."

Undoubtedly, the contract between the United States and the respective railroad companies thus embodied in the statute of July 1, 1862, contemplated the repayment by the companies to the United States of the amount of the principal and interest of the bonds so loaned to them. But how? Did the companies receiving the benefit of the bonds thus issued and delivered to them by the government thereupon become indebted to the United States therefor in the ordinary sense of that term in the amount of the principal of the bonds and such interest as the government might thereafter pay thereon, to pay which all of their property, of every character, is liable, or was the obligation assumed by the companies for the repayment of the principal and interest of the bonds so issued and delivered to them to be performed in certain defined and specified ways? This question was not involved, and therefore not decided, in any of the cases cited by counsel in which the Pacific Railroad acts have been under consideration by the supreme court. It is directly involved in the present case, for it is obvious that unless there was an absolute, unqualified promise to repay the bonds on the part of the corporations in which the deceased, Stanford, was a holder of stock, there was no personal obligation on his part to repay them.

The statute embodying the contract to be construed was drawn with great care, as has been seen from the statement of its provisions, and with much attention to details; yet it is not as explicit as it should have been. In express terms, it contains no unqualified, nor, indeed, any express, covenant on the part of the corporation receiving the bonds to repay them. If any such unqualified promise exists, it is by implication. But a covenant, as held by the supreme court in Hudson Canal Co. v. Pennsylvania Coal Co., 8 Wall. 276, cannot be implied in the absence of language showing that it was intended. It was also there held that the fact that the nonimplication of it makes the contract, in consequence of events happening subsequently to its being made quite unilateral in its advantages, is not a sufficient ground to imply a covenant which would tend to balance advantages thus preponderating. In the later case of Hale v. Finch, 104 U. S. 261–269, the same court said that according to the authorities, many of which will be

found cited in the opinion in that case, "and from the reason and sense of the thing, a covenant will not arise unless it can be collected from the whole instrument that there was an agreement or promise or engagement upon the part of the person sought to be charged for the performance or nonperformance of some act."

Recurring now to the act of July 1, 1862, embodying the contract between the United States and the railroad companies, let us see whether its terms and provisions, taken as a whole, import an absolute, unqualified agreement by the railroad companies to repay the amount of the bonds, for which repayment all of their property, of every character, is liable, or does its true interpretation require only such repayment in certain specified and defined ways, with prescribed consequences for a failure of such repayment.   It is to be observed, in the first place, that, by the express terms of the act, neither the granted lands nor the subsidy bonds were to be delivered to the railroad companies until the particular section of road to which they applied was fully completed, equipped, and ready for the service contemplated by the act.   As each section of the road was thus completed, equipped, and ready for service, the bonds pertaining to that section were to be issued and delivered to the particular company, and thereupon, by the express terms of the contract, such issue and delivery should ipso facto constitute a first mortgage on the whole line of the railroad and telegraph, in consideration of which bonds were authorized to be issued, together with its rolling stock, fixtures, and property of every kind and description.   Now, here was an express provision that, before any part of the granted aid should become effectual at all, the particular section of road to which it applied should be fully completed, equipped, and ready for the contemplated service, at which time the bonds applicable to that section should be issued and delivered to the company. · Such issue and delivery, constituting, as it does, a loan to the railroad company, imported a promise on the part of the company to repay it; but was the promise so imported an absolute, unqualified promise of the company to pay the amount that should become due the United States by reason of the loan, like an ordinary loan, for which all of the property of the borrower of every character would be liable?

The provision of the contract in respect to the repayment of the bonds was that they should be repaid "as hereinafter provided,"— that is to say, as afterwards provided in the statute; and, to secure such repayment, the issue and delivery of the bonds was by the contract made to constitute ipso facto a first mortgage on the whole line of railroad and telegraph, together with the rolling stock, fixtures, and property, of every kind and description, in consideration of which bonds were authorized to be issued.   The contract further declared that all of the grants—namely, the grants of right of way, ground for stations, etc., lands and bonds—were made upon condition, not only that the company would pay the bonds at maturity, but also should keep the railroad and telegraph line in repair and use, and at all times transmit dispatches over the telegraph line, and transport mails, troops, and munitions of war, supplies, and public stores, upon the railroad for the government, whenever required

to do so by any department thereof, and that the government should at all times have the preference, in the use of the same for all of those purposes at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service. And it was further provided that in case any company or companies accepting the provisions of the act should fail to comply with the terms and conditions thereof, by not completing said line of railroad and telegraph and branches within a reasonable time, or by not keeping the same in repair and use, but should permit the same for an unreasonable time to remain unfinished, or out of repair and unfit for use, congress should have the right to pass an act to insure the speedy completion of the road and branches, or put the same in repair and use, and direct the income of the railroad and telegraph line to be thereafter devoted to the use of the United States to repay all such expenditures caused by the default and neglect of such company or companies. And, further, that if the roads should not be completed, so as to form a continuous line of railroad, ready for use, from the Missouri river to the navigable waters of the Sacramento river by July 1, 1876, the whole of all of the railroads authorized to be constructed under the provisions of the act, together with all of their furniture, fixtures, rolling stock, machine shops, lands, tenements, and hereditaments, and property of every kind and character, should be forfeited to and taken possession of by the United States. Act 1862, §§ 5, 6, 17. Provision was thus made by the contract for the completion of the line of railroad and telegraph and branches within a certain designated time, and for their continued use and operation. In respect to the repayment to the United States of the amount of their bonds issued and loaned to the respective companies, to aid in the construction of their roads, together with the interest thereon, the contract provided, in section 6 of the act of 1862, first, that all compensation for services rendered for the government by the respective companies should be applied to the payment of the bonds and interest until the whole amount should be fully paid; that the company may also pay the United States, wholly or in part, in the same or other bonds, treasury notes, or other evidences of debt against the United States, to be allowed at par; and that after the completion of the road, until the bonds and interest are paid, at least 5 per centum of the net earnings of the road should also be annually applied to the payment thereof. These provisions of the contract, so far from limiting the promise which the law imports that the company receiving the loan would repay it, unmistakably and affirmatively point to an absolute, unqualified promise by the railroad company receiving the bonds to repay to the United States the amount of them, together with the interest thereon. They may, according to the express terms of the contract, not only be paid by the company out of the earnings of the road, but also, wholly or in part in the same or other bonds, treasury notes, or other evidences of debt against the United States, to be allowed at par. And to further secure the repayment to the United States of the amount of bonds so loaned, together with the interest thereon, it is provided by the contract, in section 5 of the act, that on the refusal or failure of the

company to redeem the bonds, or any part of them, when required so to do by the secretary of the treasury, in accordance with the provisions of the act, the road, with all the rights, functions, immunities, and appurtenances thereunto belonging, and also all lands granted to the company by the United States which, at the time of such default, shall remain in the ownership of the company, may be taken possession of by the secretary of the treasury, for the use and benefit of the United States, with a proviso that section 5 shall not apply to that part of any road then constructed.

It is earnestly insisted on the part of the defendant that this proviso indicates that it was not the intention of the act to put upon the company receiving the bonds of the government an absolute, unqualified agreement to repay to the United States the amount of them, together with the interest thereon; that such an unqualified agreement would necessarily subject any and every road the company might have to such repayment. In answer to this, it is said for the complainants that as the Central Pacific Railroad Company of California did not commence to build its road until January 13, 1863, it did not at the time of the passage of the act of July 1, 1862, have any constructed road. But that fact is manifestly wholly immaterial in arriving at the true meaning of the contract between the parties as embodied in the statute, the provisions of which, as has been seen, applied equally to all of the railroad companies mentioned in the act to which the grants were made. Whatever they meant with respect to one of them they meant with respect to all.

It is argued for the defendant, and correctly, that, if the implied promise of the company receiving the bonds was absolute and unqualified, then all of its property, including any and all roads in existence at the time of the passage of the act of 1862, would be liable to make good the promise, just as all of the property of A. who borrows from B. is liable for the repayment of the money so borrowed. Giving to the proviso to section 5, therefore, the broadest construction to which it (considered alone) is susceptible, it would undoubtedly furnish strong evidence of an intention to confine the property out of which the United States should be repaid to the granted lands and to property constructed and created in part by the aid extended by the government and its proceeds. But such a construction of the proviso to section 5 of the act of 1862 would make it clearly repugnant to, and inconsistent with, the last clause of the next section of the act, in which it is distinctly declared that the repayment to the United States of the amount of the bonds and the interest thereon may be made, wholly or in part, in the same or other bonds, treasury notes, or other evidence of debt against the United States, to be allowed at par. The legal intendment is that each clause was inserted for some useful purpose, and, relating, as they do, to the same subject, each must be read with direct reference to the other, and so read, if possible, as to avoid repugnancy. It is to be observed that section 5, to which the proviso is appended, provides for the loan of the bonds, the creating of a first mortgage on the road, in consideration of which bonds were authorized to be issued, together with its rolling stock, fixtures, etc., and for the forfeiture thereof in the

event of the failure of the company to redeem the bonds or any part of them.    The proviso was probably inserted to make clearer the fact that none of those provisions should apply to that part of any road then constructed.    At all events, in view of the other provisions of the act to which reference has been made, and especially in view of the provision that the company might repay the United States, wholly or in part, in the same or other bonds, treasury notes, or other evidences of debt against the United States, to be allowed at par, it is impossible that the agreement of the company to repay the loan can be limited to the road and its appurtenances.

But because the Central Pacific Railroad Company of California and the Western Pacific Railroad Company, like all of the other railroad companies accepting the terms and provisions of the act of July 1, 1862, and receiving bonds of the United States thereunder, thereby assumed an absolute and unqualified promise to repay the amount of them to the United States, together with the interest thereon, does it follow that the stockholders of the California corporations named became personally liable for the debt of those companies?    Beyond question there is no common-law liability for such a debt.    The individual liability of stockholders in a corporation for the payment of its debts is always a creature of statute.    Pollard v. Bailey, 20 Wall. 520.    On the part of the government it is strenuously urged that the laws of California under which the Central Pacific Railroad Company of California and the Western Pacific Railroad Company were incorporated fixed upon the stockholders thereof an individual liability for the debts of those corporations, and that the rights of the parties to the present suit are to be tested by those laws of the state of California.    Both of the California corporations named were incorporated, as has been seen, under and by virtue of the provisions of the act of the legislature of California, approved May 20, 1861 (St. Cal. 1861, p. 607).    At that time the provisions of the constitution of California in relation to the subject in hand were sections 32 and 36 of article 4 of the constitution of 1849, already given in full. It is plain, therefore, that whatever individual liability the stockholders of the Central Pacific Railroad Company of California and the Western Pacific Railroad Company incurred is to be found in those provisions of the constitution of 1849, and in the provisions of the act of the legislature of California of May 20, 1861.

In 1864, the supreme court of California, in the case of French v. Teschemacher, 24 Cal. 518, fully considered and construed sections 32 and 36 of article 4 of the constitution of 1849.    It there held that section 32 was a positive injunction requiring the legislature to provide security for corporate dues by laws imposing, in connection with other means, some degree of individual liability upon the members of the corporation, but leaving the extent of that liability to the wisdom and sound discretion of the legislature, and that, while section 36, considered by itself, would seem, upon first impression, to fix the precise degree of liability, leaving no room for the exercise of legislative judgment, yet the apparently conflicting provisions of the constitution should be so construed as to give force and effect to each; that section 36 was not self-executing, in that it did not

determine the proportion of the debts and liabilities of the corporation for which the stockholder should be liable, nor prescribe any rule by which that proportion could be ascertained; and, as a necessary result, that legislation was necessary to give the constitutional provisions on the subject a reasonable and practicable operation. That this construction of the constitution of 1849 by the highest court in existence under it is binding on this court is thoroughly settled. Resort must therefore be had to the state statute to see what, if any, individual liability was thereby fastened on the stockholders of the Central Pacific Railroad Company of California and the Western Pacific Railroad Company for their corporate debts and liabilities.

The two California corporations named, which received the bonds from the United States at times when the defendant's testator was a large holder of stock therein were, as has been seen, incorporated under the state act of May 20, 1861, in which it was declared that each stockholder should be "individually liable to the creditors of such company for his proportion, that is to say, in proportion to the amount of stock by him held, for all the debts and liabilities of such company, except" those incurred after he should cease to be a stockholder. The stockholder's liability for the corporate debts and liabilities as here defined by the statute is "for his proportion—that is to say, in proportion to the amount of stock by him held." This statutory provision is but little more definite than section 36 of article 4 of the constitution of 1849 and no more definite than the provision contained in section 32 of the act concerning corporations, passed in 1850 (Wood's Dig. 115), which was held by the court in French v. Teschemacher, supra, to be insufficient to give a reasonable and practicable operation to section 36 of article 4 of the constitution of 1849.

It is manifest that the declaration that the stockholder is liable for all the debts and liabilities of the corporation "in proportion to the amount of stock by him held" does not establish any rule by which any definite liability can be fixed. Proportion to what? Whether to the whole amount of the capital stock, or to the amount of the subscribed capital stock or any other ascertainable proportion, is not stated. As to that essential element of the problem, the statute of 1861, like the constitution of 1849, is entirely silent. It is true that by subsequent statutes, as well as by the subsequent constitution of 1879, the liability of stockholders in the state corporations is definitely fixed. Thus, by a statute passed April 27, 1863, to amend the act of May 20, 1861, it is declared that each stockholder "shall only be individually liable to the creditors of such company for his proportion, that is to say, the proportion that the amount of stock by him held bears to the whole amount of the capital stock of such company, of all the debts and liabilities of the company contracted or incurred during the time he was a stockholder." St. Cal. 1863, p. 610. By section 322 of the Civil Code of California it is provided that "each stockholder of a corporation is individually and personally liable for such proportion of its debts and liabilities as the amount of stock or shares owned by him bears to the whole of the subscribed capital stock or shares of the corporation, and for a like

proportion only of each debt or claim against the corporation." And by section 3 of article 12 of the state constitution of 1879 it is declared that "each stockholder of a corporation, or joint stock association, shall be individually and personally liable for such proportion of all its debts and liabilities contracted or incurred during the time he was a stockholder, as the amount of stock or shares owned by him bears to the whole of the subscribed capital stock or shares of the corporation or association." But it is manifest that the state laws fixing the liability of stockholders, passed subsequent to the making of the contract, which is the basis of the present suit, have no application to the questions here involved.

At the time, therefore, that the Central Pacific Railroad Company of California and the Western Pacific Railroad Company accepted the provisions of the act of congress of July 1, 1862, upon which acceptance the contract between them and the United States arose, the laws of the state under which those companies were incorporated had not fixed upon the stockholders of such corporations any definite individual liability for the corporate debts, or prescribed any rule by which any such definite individual liability could be ascertained. With respect to contracts then made, the corporations in question, therefore, stood as if there had been no constitutional or statutory provisions in relation to the individual liability of stockholders for corporate debts and liabilities; for it is plain that a constitutional provision requiring legislation to give it effect is, until such legislation is had, ineffectual, and that a statute which is too indefinite to give a reasonable and practicable operation to the constitutional provision is as if it had not been enacted. That a contract made in the absence of such a liability is unaffected by a subsequent statute fixing it is elementary. Any other rule would be to sanction a most material change in the contract itself, to the manifest injury of one of the contracting parties. But even if, by the laws of California in existence at the time of the making of the contract in question, the individual liability of the stockholders of the Central Pacific Railroad Company of California and the Western Pacific Railroad Company had been clearly defined and fixed, the result, I think, must be the same; for it seems clear to me that this suit is dependent, not upon what the laws of California may or may not have provided in respect to the liabilities of stockholders of corporations organized under those laws, but upon the contract made between the United States and the railroad companies in which defendant's testator was a stockholder. The grants contained in the Pacific Railroads acts, and constituting the contract which is the basis of the suit, are, as has already been said, sui generis. They have been so characterized by the supreme court. Union Pac. R. Co. v. U. S., 104 U. S. 665.

The whole scope and tenor of the legislation constituting the contract under which the line of railroad and telegraph was constructed, in consideration of which the bonds in question were issued and loaned to the Central Pacific Railroad Company of California and the Western Pacific Railroad Company, respectively, unmistakably show that no personal liability of the individual stockholders was contem-

plated, either by the United States, on the one side, or the railroad companies and their stockholders, on the other side. Wherever, in its undertaking to secure the building of the road and its connections, congress granted aid, whether in rights of way, station grounds, lands, or bonds, to any railroad company, it granted it upon precisely the same terms and conditions that it granted similar aid to the other companies mentioned in the act. Each and every company to which aid was extended was put, in respect to such aid, upon exactly the same footing. If there is anything clear in the provisions of the statute upon the subject, it is this fact. True, the Central Pacific Railroad Company and the Western Pacific Railroad Company were incorporated under and by virtue of the laws of California; but congress, in and by its legislation, adopted them as instruments in the execution of its purpose to secure the construction of the road the country needed, and conferred upon them certain powers, rights, privileges, and immunities independent of and wholly apart from those derived from their state charters. Whether or not the state of California could have objected to that action of congress, it is not important to inquire. So far from objecting, the state assented thereto, and, as far as it could, ratified and confirmed the action of congress in the premises. St. Cal. 1863–64, p. 471; Sinking Fund Cases, 99 U. S. 728. In the case last cited, the supreme court, in speaking of the California charter of the Central Pacific Railroad Company of California, said that no power was thereby "granted to build any road outside the state, or in the state except between the termini named," but that, "by the act of 1862, congress granted this corporation the right to build a road from San Francisco or the navigable waters of the Sacramento river to the eastern boundary of the state, and from there, through the territories of the United States, until it met the road of the Union Pacific Company. For this purpose, all the rights, privileges, and franchises were given this company that were granted the Union Pacific Company, except the franchise of being a corporation, and such others as were merely incident to the organization of the company. The land grants and subsidy bonds to this company were the same in character and quantity as those to the Union Pacific, and the same right of amendment was reserved. Each of the companies was required to file in the department of the interior its acceptance of the conditions imposed, before it could become entitled to the benefits conferred by the act. This was promptly done by the Central Pacific Company, and in this way that corporation voluntarily submitted itself to such legislative control by congress as was reserved under the power of amendment." 99 U. S. 727, 728.

The Western Pacific Railroad Company, as has already been shown, and, indeed, as is alleged in the bill, occupied precisely the same position as that of the Central Pacific Railroad Company of California. The theory upon which the decision of the supreme court, in the Sinking Fund Cases proceeds, in so far as concerns the two California corporations, is that, to the extent of the powers, rights, privileges, and immunities granted them by congress, they are to be regarded as the creatures of congress, and in precisely the

same light as the Union Pacific Company. The logic of this is that the contract in respect to the subsidy bonds was precisely the same with the California corporations that it was with the Union Pacific Company, and to be measured by the same standard. The act of congress embodying the contract in respect to each of the corporations not having provided for any individual liability on the part of their stockholders, none can be held to exist. Pollard v. Bailey, supra; Carroll v. Green, 92 U. S. 512.

Had the provisions of the act of July 1, 1862, remained unchanged, and the road been built solely thereunder, the government, with the retention of all compensation for services rendered for it by the companies, and 5 per centum of their net earnings, and a first mortgage on the entire aided road, with its appurtenances, would undoubtedly have been sure of the repayment of the bonds as provided in and by the act. But to speed the enterprise, and to further aid in the construction of the roads, congress passed the act of July 2, 1864, by which, as has been seen, the grant of lands was doubled, a provision inserted that only one-half of the compensation rendered by the railroad companies for the government should be required to be applied to the payment of the bonds issued by the government, and by which the United States waived their first lien for the repayment of the amount of its bonds, with interest, and consented that the railroad companies to which the grants applied should issue their own bonds in like amounts, which should be secured by a lien on their respective roads paramount to the lien of the United States. While this generosity on the part of the government clearly entitled it to the utmost good faith on the part of the railroad companies in all their dealings with the United States, it cannot justify the court in departing from the true interpretation of the contract as the parties themselves made it.

The views that have been expressed render it unnecessary to consider other questions argued by counsel; and if they are sound, of which I have no doubt, it is apparent that no amendment of the bill can make good the complainants' claim in this case. Nevertheless, leave will be given the complainants to amend, if they shall be so advised.

Demurrer sustained, with leave to complainants to amend within the usual time.